IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| KELLY BAXTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:24-cv-342 (RDA/IDD) |
| ) | |
| HII MISSION TECHNOLOGIES CORP., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on HII Mission Technologies Corporation's Motion to Dismiss the Complaint ("Motion") (Dkt. 42). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with Defendant's Memorandum in Support (Dkt. 44), Plaintiff's Opposition Brief (Dkt. 59), and Defendant's Reply Brief (Dkt. 60), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion for the reasons that follow.

I. BACKGROUND

A. Factual Background[1]

Plaintiff Kelly Baxter is a Black woman,[2] formerly employed by Huntington Ingalls Industries ("HII"). Dkt. 40 ¶¶ 3, 9. In March 2022, Plaintiff began working as a Business

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] In her Complaint, Plaintiff makes passing references to race and/or color discrimination, however, Plaintiff has not asserted a race or color discrimination claim in this case. Accordingly,

1

Development Analyst for Alion Science and Technologies, which then merged into HII in April 2022. *Id.* ¶ 9. Plaintiff was supervised by Doug Jankovich and Ken Diller, and was trained by Scott Leonard. *Id.* ¶ 10.

Starting in April 2022 until June 2023, Scott Leonard "flirtatiously jok[ed] with Plaintiff[,] persistently invited her to have dinner with him . . .[, and] g[ave] her unwanted touches at work." *Id.* ¶ 13. As a part of these interactions, Plaintiff alleges that,

> Scott Leonard blocked Plaintiff in a U-shaped desk in her office, refusing to leave until he initiated a frontal hug. On other occasions he would sit uncomfortably close, so that their arms or legs would touch, and insist on walking her to her car despite her protests, where he would attempt to hug her.

*Id.* ¶ 14.

In September 2022, Plaintiff was required to stay late with Scott Leonard, and during their conversation, "[Scott Leonard] told her he wondered what it was like to date her, and later offered to buy her an alcoholic beverage, and when she declined, he said 'Aww, you mean I can't get you drunk.'" *Id.* ¶ 18. Scott Leonard also made other lewd comments towards Plaintiff including, "[y]ou have a lucky man at home." *Id.* ¶ 27. Scott Leonard moved his office across from Plaintiff's office, then remarked, "I can always see you now." *Id.* Additionally, Plaintiff's colleague Brad Knock witnessed Scott Leonard taking a photo of Plaintiff in her office, without her knowledge. *Id.* ¶ 26.

Plaintiff communicated to Scott Leonard that she was not comfortable being touched by him and did not appreciate his inappropriate comments. *Id.* ¶ 16.

On October 5, 2022, Plaintiff confided in manager Mike Sweet, and he urged her to report her concerns to Human Resources ("HR"). *Id.* ¶ 20. On October 6, 2022, Plaintiff contacted

---

for brevity, any allegations pertaining to such claims of race or color discrimination have been omitted from this summary of the facts.

Miranda Williams in HR, seeking confidential advice and guidance on possibly filing a complaint. *Id.* ¶ 21. On October 7, 2022, HR Lead Keemani Henry reached out to Plaintiff to address her concerns of sexual harassment by Scott Leonard. *Id.* ¶ 22. During their meeting, Keemani Henry expressed her admiration for Scott Leonard to Plaintiff, likening him to "everyone's favorite grandpa." *Id.* ¶ 23. Keemani Henry advised Plaintiff to document the sexual harassment incidents and submit a written timeline, and concluded the meeting by stating "she would conduct a discreet investigation to determine if others had similar experiences." *Id.* Keemani Henry later reached out to Plaintiff to state she had no findings, and would take no action; and sent Plaintiff materials on sexual harassment in the workplace. *Id.* ¶¶ 24-25.

After Plaintiff reported the sexual harassment to HR, "Scott Leonard's behaviors became increasingly hostile," including withdrawing training from Plaintiff, disparaging her work product, and continuing to suggest to Ken Diller that Plaintiff be assigned to work more closely with Scott Leonard. *Id.* ¶ 28. Further, upon reporting her concerns to HR, Plaintiff noticed that "her workload suddenly began increasing without proper training." *Id.* ¶ 29.

HR suggested that Plaintiff "was being paranoid or possibly making things up [when] [Plaintiff] reached out with additional incidents and inquired about guidance/updates." *Id.* ¶ 30. Keemani Henry further "suggested that Plaintiff should 'not overthink it,' stating that 'sometimes people make things up in their head'" upon Plaintiff's further reports to HR. *Id.*

During this time, Plaintiff's co-workers (both existing and those hired after her), received official career training, which included schedule accommodations to attend their desired trainings. *Id.* ¶ 33. Specifically, Brad Nock, a proposal manager hired after Plaintiff had started working, received career development training shortly after onboarding, and beyond his initial training, after

3

working with Plaintiff on various group tasks and had his schedule cleared to take three or more career development courses. *Id.* ¶¶ 31, 34.

On October 26, 2022, and on November 7, 2022, Keemani Henry from HR asked Plaintiff if the sexual harassment materials were helpful. *Id.* ¶ 35. Plaintiff responded on November 8, 2022, "stating that the overall environment had not improved," and "new hire Brad Nock had noticed the disturbing behavior of Scott Leonard and offered himself as a buffer." *Id.*

As time went on, Scott Leonard "began to blatantly ignore Plaintiff and push harder workloads" on her. *Id.* ¶ 36. In one instance, upon observing Brad Nock and Plaintiff working together from a conference room doorway, he stated "You guys look good together." *Id.*

On March 3, 2023, Keemani Henry from HR reached out to Plaintiff for an update and Plaintiff responded with "a detailed update of hostile work environment, unwanted touching, disparate treatment, harassment, and even [Scott] Leonard being witnessed by another employee taking [Plaintiff's] photo without her knowledge while in [the] office." *Id.* ¶ 39. On the same day, Plaintiff also received her first annual performance evaluation conducted by manager Ken Diller, overall receiving an "Excellent Performer" evaluation. *Id.* ¶ 40.

On May 17, 2023, Scott Leonard encouraged Plaintiff to apply for the Proposal Manager position and provided her with Rick Rossi's contact information. *Id.* ¶ 47. On May 18, 2023, Plaintiff met with Rick Rossi to confirm her interest in the Proposal Manager role and to discuss the internal transition process. *Id.* ¶ 48. However, just a few days later, Scott Leonard arranged a meeting with Plaintiff to discuss a potential travel support role, which she attempted to decline, but Scott Leonard asserted that the lateral move was not a demotion. *Id.* ¶¶ 50-52. Scott Leonard further stated that Plaintiff's position was being dissolved, and Plaintiff would need to make the transition to her new role the following week. *Id.* ¶¶55-56. Plaintiff alleges that Plaintiff's

previously approved career training was revoked and the formal paperwork for transfers was not completed. *Id.* ¶¶ 58-59. After the transition meeting with Scott Leonard, Plaintiff reported the retaliatory hostile behavior she experienced to Keemani Henry from HR, who did not respond until June 13, 2023. *Id.* ¶ 60. Plaintiff then moved forward in her new role and implemented the training that was provided to her. *Id.* ¶ 64-65.

In August of 2023, Plaintiff reached out to the EEOC. *Id.* ¶ 66. On September 5, 2023, Plaintiff was contacted by Melody Walker, a new hire, for onboarding material because she was taking on Plaintiff's old role. *Id.* ¶ 66. On October 26, 2023, Plaintiff was again transferred to a new contract, even though employees were required to work six months in a given position before transferring per company policy. *Id.* ¶ 69. Shortly after being assigned to the new contract, Plaintiff was placed on a Performance Improvement Plan ("PIP"). *Id.* ¶ 73.

On November 29, 2023, Plaintiff was scheduled for her first PIP meeting. *Id.* ¶ 74. The PIP required a minimum of two daily check-in meetings with Bill McDonough and Pauline Tudor, her new managers, as well as a daily activity submission detailing any and all items worked. *Id.* ¶ 75. The PIP "emphasized that Plaintiff[] improve communications immediately . . . within a target of a revised 60 days or face immediate termination." *Id.*

On December 4, 2023, Plaintiff attended an HR meeting with Keemani Henry and HR Business Partner Anna Braxton where Plaintiff complained of the adverse actions being taken against her based on her reports of sexual harassment and a hostile work environment to HR. *Id.* ¶ 76. Keemani Henry responded to Plaintiff by "claim[ing] she initially did not mention [] Plaintiff's complaints to anyone," "stat[ing] that [] Plaintiff's team had a lot of movement," and "confirmed that [Plaintiff's original] position was being dissolved." *Id.* In that meeting, Keemani

5

Henry confirmed that "group president Todd Gentry was provided with Plaintiff's emails" asserting retaliation for reporting harassment. *Id.* ¶ 77.

On December 5, 2023, Bill McDonough and Keemani Henry led Plaintiff's second PIP meeting which revised the existing PIP. *Id.* ¶ 80. On December 6, 2023, Bill McDonough sent Plaintiff an email with information on bereavement leave, but later "shamed her in a written PIP evaluation stating that very few days were worked for the month." *Id.* ¶ 81. On December 8, 2023, Plaintiff received an email indicating she was taking excessively long to complete an assignment. *Id.* ¶ 82. On December 12, 2023, Bill McDonough held another PIP meeting with Plaintiff, providing a list of tasks. *Id.* ¶ 87. On December 19, 2023, HR representative Macatherine Maciano contacted Plaintiff to notify her of a forthcoming investigation into her harassment complaints. *Id.* ¶ 89. On December 20, 2023, Plaintiff, after being granted permission by Bill McDonough to do so, left work early due to being sick with the flu., However, this was later cited against her during a subsequent PIP meeting. *Id.* ¶ 90.

On December 21, 2023, Plaintiff filed a formal complaint with the EEOC. *Id.* ¶ 88. On January 2, 2024, Plaintiff received her EEOC Notice of Right to Sue. *Id.* ¶ 92.

On January 8, 2024, Catherine Mayo and Marlene Howard from HR met with Plaintiff and requested that Plaintiff provide detailed information about her communications with Keemani Henry regarding Scott Leonard. *Id.* ¶ 93. On January 10, 2024, during another PIP meeting, Bill McDonough assigned new tasks to Plaintiff, for which she had no previous training and received only a brief explanation. *Id.* ¶ 94.

For the duration of her PIP, Plaintiff had daily meetings with Bill McDonough, Pauline Tudor, and others, where "Plaintiff was often commended for contributions," however, Plaintiff

6

"continued to receive unjust claims that her performance was still lacking" in her official PIP review meetings. *Id.* ¶ 96.

On February 2, 2024, Catherine Mayo and Marlene Howard from HR met with Plaintiff to inform Plaintiff on the results of their internal investigation. *Id.* ¶ 98. They stated "[at] this time we cannot substantiate the sexual harassment claim; however, we are taking appropriate action regarding the photography in the workplace." *Id.* During her tenure with Defendant, Plaintiff experienced various health effects as a result of her experiences, *inter alia*, "severe anxiety and depression, panic attacks, stress-induced flares of hives . . . nosebleeds, insomnia, . . . elevated blood pressure [and] PTSD." *Id.* ¶ 99.

### B.  Procedural Background

On March 1, 2024, Plaintiff filed her Complaint against Defendant HII. Dkt. 1. On April 10, 2024, Defendant filed its motion to dismiss Plaintiff's original Complaint. Dkt. 6. On May 1, 2024, Plaintiff filed a motion seeking both an extension of time to respond to HII's motion to dismiss and leave to file an amended complaint. Dkt. 13. On May 3, 2024, this Court granted Plaintiff's extension of time to file a response until May 15, 2024. Dkt. 17. Plaintiff did not file any response by that deadline. In the same May 3, 2024 Order, this Court held Plaintiff's request to file an amended complaint in abeyance, as the Court required a review of Plaintiff's proposed amended complaint. *Id.* This Court therefore ordered Plaintiff to file a proposed amended complaint no later than May 8, 2024. *Id.*

On May 8, 2024, Plaintiff filed a proposed amended complaint. Dkt. 20. On May 22, 2024, Defendant filed its opposition to Plaintiff's proposed amended complaint. Dkt. 23. On May 24, 2024, Magistrate Judge Ivan D. Davis heard argument on Plaintiff's motion. At the conclusion of argument, the Court took Plaintiff's motion under advisement and permitted Plaintiff until May

31, 2024, to file any additional submission with the Court to address issues raised in Defendant's Opposition and during the hearing. Dkt. 25. Subsequently, on May 31, 2024, Plaintiff filed a response to Defendant's motion to dismiss (Dkt. 27) and a new proposed amended complaint (Dkt. 29).

On June 6, 2024, Defendant again filed an opposition, this time to Plaintiff's request to file the May 31 proposed amended complaint. Dkt. 31. On June 7, 2024, Judge Davis again heard argument on Plaintiff's request to file an amended complaint. At the conclusion of the hearing, Judge Davis permitted Plaintiff to amend her complaint, but required that she remove certain claims. Dkt. 33. On June 12, 2024, Plaintiff filed an amended complaint, Dkt. 35, however, on June 21, 2024, Judge Davis ordered Plaintiff to remove impermissible allegations from the amended complaint and re-file the amended complaint no later than June 26, 2024, Dkt. 37.

On June 26, 2024, Plaintiff filed two versions of her amended complaint. Dkts. 39, 40. Judge Davis accepted the second version of the amended complaint, Dkt. 40, and deemed it the operative complaint as of July 1, 2024, Dkt. 41.

On July 15, 2024, Defendant filed its Motion to Dismiss Plaintiff's Operative Amended Complaint with an accompanying Roseboro Notice. Dkts. 42, 43.

On September 24, 2024, Plaintiff again attempted to file a motion to amend her complaint. Dkt. 46. On October 11, 2024, Defendant responded in opposition to Plaintiff's motion to amend. Dkt. 47. On October 24, 2024, Plaintiff filed her reply in support of her motion to amend. Dkt. 48. On November 20, 2024, Judge Davis denied Plaintiff's motion to amend the complaint. Dkt. 50.

On January 8, 2025, this Court advised Plaintiff of her rights to file a response in opposition to Defendant's Motion to Dismiss by January 29, 2025, in accordance with *Roseboro*. Dkt. 51.

On February 11, 2025, Plaintiff filed a motion for leave to file an out-of-time response to Defendant's Motion to Dismiss, Dkt. 54, which Judge Davis then granted, Dkt. 58. On February 12, 2025, Plaintiff filed her response in opposition to Defendant's operative Motion to Dismiss. Dkt. 59. On February 18, 2025, Defendant filed its reply in support of its Motion to Dismiss. Dkt. 60. On March 10, Plaintiff filed a further sur-reponse in opposition to Defendant's Motion to Dismiss. Dkt. 62.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, in reviewing a motion to dismiss, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." *Coleman v. Maryland Ct. of App.*, 626 F.3d 187, 189 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of App. of Md.*, 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks and citation omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. *See id.*; *Twombly*, 550 U.S. at 556. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

The factual allegations must be sufficient to "raise a right to relief above the speculative level" so as to "nudge[ ] the[ ] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.  Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).[3]

### III. ANALYSIS

Plaintiff's Amended Complaint asserts five counts: (i) a sexual harassment-based hostile work environment pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"); (ii) retaliation under Title VII; (iii) a sexual harassment-based hostile work environment pursuant to the Virginia Human Rights Act, Va. Code § 2.2-3900, *et seq.*, (the "VHRA"); (iv) retaliation under the VHRA; and (v) discrimination on the basis of sex pursuant to the Equal Pay Act, 29 U.S.C. § 206(d).  Dkt. 40 at 15-19.  Defendant argues that: (i) Plaintiff fails to state a hostile work environment claim in Counts 1 and 3; (ii) Plaintiff failed to exhaust her retaliation claims and further that Plaintiff fails to sufficiently allege a causal connection between her

---

[3] Although "[a] document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted), the Fourth Circuit has "not read *Erickson* to undermine *Twombly*'s requirement that a pleading contain more than labels and conclusions," *Giarratano v. Johnson*, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (internal quotation marks omitted) (dismissing *pro se* complaint); *accord Atherton v. District of Columbia Off. of the Mayor*, 567 F.3d 672, 681-82 (D.C. Cir. 2009) ("A *pro se* complaint . . . 'must be held to less stringent standards than formal pleadings drafted by lawyers.' But even a *pro se* complainant must plead 'factual matter' that permits the court to infer 'more than the mere possibility of misconduct.'" (first quoting *Erickson*, 551 U.S. at 94; then *Iqbal*, 556 U.S. at 679)).

protected activity and the adverse employment actions in Counts 2 and 4; and (iii) Plaintiff fails to state an Equal Pay Act claim in Count 5. Dkt. 44. The Court will address each argument in turn.

## A. VHRA Claims

As a threshold matter, this Court considers whether Plaintiff has administratively exhausted her VHRA claims (Counts 3 and 4). The VHRA "includes an extensive administrative procedure that must be exhausted before an employee may file a lawsuit under the VHRA." *Richardson v. Maximus, Inc.*, 2023 WL 4687188, at *8 (E.D. Va. July 21, 2023) (citing *Jordan v. Sch. Bd. of the City of Norfolk*, 2022 WL 16835868, at *11 (E.D. Va. Nov. 9, 2022)). An aggrieved individual must make a complaint with the Virginia Office of Civil Rights (Virginia's Fair Employment Practices Agency, or "FEPA"), which then prompts FEPA to initiate an investigation to determine whether there is reasonable cause to believe the allegations of discrimination. Va. Code Ann. § 2.2-3907 (2022). Regardless of the investigation's outcome, a private citizen cannot sue until they have been provided with a "notice of [his or her] right to file a civil action." Va. Code Ann. § 2.2-3908(A) (2022).

Here, the Amended Complaint maintains that Plaintiff received a right-to-sue notice from the EEOC, Dkt. 40 ¶ 92, but does not contain a corollary allegation that she received a right-to-sue notice from FEPA. Critically, federal courts have interpreted the VHRA to require a right-to-sue notice that is separate from the EEOC notice. *See Jordan*, 2022 WL 16835868, at *11-13 (rejecting employee's argument that the EEOC right-to-sue notice served as a right-to-sue notice under the VHRA); *Moss v. Saja Rest. Grp., LLC*, 2023 WL 3034605, at *11-12 (W.D. Va. Apr. 21, 2023) (relying on *Jordan* in concluding that plaintiff's failure to request and receive a right-to-sue notification from FEPA is fatal to his state-law claims even though he received a notice from the EEOC). As such, this Court finds that Plaintiff has not provided sufficient allegations of

compliance with the exhaustion requirements of the VHRA, and accordingly, this Court will dismiss Plaintiff's VHRA claims (Counts 2 and 4) without prejudice.

### B. Hostile Work Environment Title VII Claim

Next, Defendant asserts that Plaintiff's hostile work environment claim under Title VII should be dismissed. To state a hostile work environment claim, Plaintiff must allege sufficient facts to show that the alleged conduct she experienced was: (1) unwelcome; (2) based on a protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment; and (4) imputable to her employer. *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495-96 (4th Cir. 2015). Stated differently, a plaintiff must plausibly plead that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). There is no precise formula for determining whether a work environment is "abusive" or "hostile"; such a determination can be made "only by looking at all the circumstances." *Id.* at 23. Defendant primarily argues that Plaintiff has failed to assert facts establishing conditions so severe or pervasive as to alter the conditions of employment. Dkt. 44 at 7-10.

Here, Plaintiff's allegations related to her hostile work environment claim generally boil down to the summary that she was subject to sexually harassing conduct, beginning in April 2022 to June 2023, by Scott Leonard, one of her supervisors. Dkt. 40 ¶¶ 10-28. Specifically, and most egregiously, Plaintiff states that Scott Leonard blocked her in a desk "until he initiated a frontal hug." Id. ¶ 14. And on more than one occasion, Scott Leonard sat uncomfortably close to Plaintiff, causing arms or legs to touch, and touched her back and sides. *Id.* ¶¶ 14, 26. Scott Leonard moved

12

his office across from Plaintiff's and remarked that "[he could] always see [her] now" and another colleague reported seeing Scott Leonard take a photo of Plaintiff without her knowledge. *Id.* ¶¶ 26, 27. Plaintiff alleges that this conduct by Scott Leonard continued for many months, to the point where a new colleague, Brad Nock, noticed the behavior of Scott Leonard towards Plaintiff and offered himself as a buffer. *Id.* ¶ 35. Plaintiff states that she "made it clear to Scott Leonard that she was not comfortable being touched by him nor with his lewd statements." *Id.* ¶ 16.

Courts in this Circuit have indicated that "inappropriate physical touching is certainly a strong indicator of a hostile work environment." *Williams v. Silver Spring Volunteer Fire Dept.*, 86 F. Supp. 3d 398, 414 (D. Md. 2015); *see, e.g.*, *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (finding a genuine dispute of material fact for the severe or pervasive element of a hostile work environment claim based on conduct including disparaging jokes and inappropriate touching); *Beardsley v. Webb*, 30 F.3d 524, 528-29 (4th Cir. 1994) (finding a hostile work environment when a supervisor massaged an employe's shoulder amongst other sexual comments); *Mercado v. Lynnhaven Lincoln-Mercury, Inc.*, 2011 WL 5027486 (E.D. Va. Oct. 21 2011) (finding a hostile work environment when plaintiff was subjected to unwanted touching, sexual comments, and propositions).

In this case, Plaintiff's allegations are sufficient to plausibly plead that the sexual harassment she faced meets the severe or pervasive threshold. Plaintiff identifies specific instances where Scott Leonard forced the initiation of unwanted touching without her permission, in addition to Leonard's lewd comments made throughout their working relationship. Accordingly, Plaintiff's allegations regarding Scott Leonard's conduct meet the severe or pervasive standard, and thus, Plaintiff has sufficiently pleaded her hostile work environment claim pursuant to Title VII.

C. Retaliation Title VII Claim

13

With respect to Plaintiffs' retaliation claim, Defendant raises two grounds for the dismissal: (1) that Plaintiff failed to exhaust her retaliation claim, and (2) that Plaintiff has failed to sufficiently allege a retaliation claim due to the lack of a causal link between the protected activity and the adverse employment action. The Court will take each of these grounds in turn.

### 1. Failure to Exhaust - Title VII Retaliation

Defendant avers that Plaintiff has failed to exhaust her administrative remedies with respect to her retaliation claim because Plaintiff received her right-to-sue letter from the EEOC on January 2, 2024, however, Plaintiff's Amended Complaint alleges supposedly retaliatory conduct occurring in January and February 2024 – after she received her right-to-sue notice. Dkt. 40 ¶ 8. Neither party has attached a copy of the right-to-sue letter to the briefs filed in this litigation.

Importantly, Plaintiff has alleged that the retaliatory conduct occurring in January and February 2024 (after the issuance of her right-to-sue notice from the EEOC) was part of ongoing retaliatory actions being taken against her in her employment. *See Duplan v. City of New York*, 888 F.3d 612, 624 (2d Cir. 2018) ("[R]etaliation claims arising during or after an EEOC investigation are deemed exhausted when a plaintiff seeks to join them to a timely filed lawsuit on his original, exhausted claims, because it would be burdensome and wasteful to require a plaintiff to file a new EEOC charge instead of simply permitting him to assert that related claim in ongoing proceedings to adjudicate the underlying charge."). Accordingly, the Court will deny Defendant's Motion to the extent that it argues that Plaintiff has failed to exhaust her administrative remedies with respect to her retaliation claim pursuant to Title VII.

### 2. Failure to State a Claim – Title VII Retaliation

To state a *prima facie* retaliation claim under Title VII, Plaintiff must sufficiently allege "(1) that [she] engaged in protected activity, (2) that the employer took a materially adverse action

14

against [her] and (3) there is a causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (internal citations omitted). To allege a "materially adverse action" for a Title VII retaliation claim, Plaintiff must allege that her employer took actions that may dissuade a reasonable employee from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). To establish causation, Plaintiff must allege facts sufficient to reasonably infer that her protected activity was the "but-for" cause of her supervisors' alleged adverse actions. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under [Section] 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."). If an adverse action occurs soon after an employee engages in protected activity, this raises a presumption of causation. "A causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (quoting *Price v. Thompson*, 380 F.3d 209, 213). If, however, temporal proximity between the protected conduct and alleged adverse action is lacking, Plaintiff must allege that their employer exhibited "continuing retaliatory conduct and animus" in the intervening period. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

Taking all facts alleged in the Amended Complaint as true, Plaintiff alleges that she engaged in protected conduct when she reported the behavior of Scott Leonard to HR in early October 2022 and followed up with HR again in November 2022, and when she filed her EEOC charge alleging sexual harassment and a hostile work environment on December 21, 2023. Dkt. 40 ¶¶ 20-25, 35, 88; *see* 42 U.S.C. § 2000e-3(a) (providing that an individual who has "made a

charge" has engaged in protected activity). Defendant does not dispute that Plaintiff engaged in a protected activity. *See* Dkt. 44. Accordingly, Plaintiff has sufficiently alleged the first element of retaliation.

Without addressing whether Plaintiff has sufficiently pleaded the second element, that HII took materially adverse actions against her, the Court finds that Plaintiff falters in alleging a causal connection between her protected activities and the alleged adverse actions. A showing of causality requires "either 1) that the retaliation closely followed the protected activity, or 2) that the plaintiff put forth a sufficient explanation for the delay between the protected activity and the alleged retaliation." *Reardon v. Herring*, 201 F. Supp. 3d 782, 784 (E.D. Va. 2016) (internal citations omitted). Plaintiff's allegations related to her retaliation claim can be generally placed into two categories of potentially adverse actions taken against her by Defendant: (i) incidents occurring in or around May 2023, including Defendant revoking Plaintiff's approved career training and unselecting her for a new role which she had been tentatively approved for, dissolving her position, and transferring her to a new position; and (ii) placing Plaintiff on a PIP in and around November 2023 and December 2023. Dkt. 40 at 16.

Plaintiff alleges that she was denied an opportunity to attend training, was de-selected from a position, and moved to a different position, no earlier that late-May 2023. *Id.* ¶ 42-52. However, Plaintiff had filed her complaint of sexual harassment and hostile work environment claim with HR in October of 2022, with a follow up conversation occurring in November 2022. *Id.* ¶¶20-25, 35. Plaintiff then provided HR with an update of the harassment and hostile work environment she was enduring on March 3, 2023. *Id.* ¶ 39. This puts roughly a two-month and 18-day gap between her complaint to HR and the training opportunity denial, dissolving of her position, and her transfer to a new position. While there is no bright-line rule for how closely an adverse action

must follow a protected activity for causation purposes, courts have consistently held that periods over a few months are insufficient to infer causation. *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (dealing with a schoolteacher who was terminated at the end of the academic year, just over two months after his supervisor learned of his protected activity and noting that a two month temporal gap "is sufficiently long so as to weaken significantly the inference of causation between the two events"); *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (holding that a three-month gap between plaintiff's complaint and his discharge "is too long to establish causation, without more"); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (affirming dismissal of retaliation claim where "there was a least a two-month temporal gap between" the plaintiff's protected activity and the alleged retaliatory conduct); *Roberts v. Glenn Industrial Grp.*, 998 F.3d 111, 127 (4th Cir. 2021) ("Although there is no 'bright-line rule' for temporal proximity, courts within our Circuit have found that shorter lapses of time similar to the three-month period at issue in the case before us are insufficient to infer a causal relationship without other evidence of a causal link."). Accordingly, given the significant temporal gap between Plaintiff's complaints to HR and the alleged employment actions she faced in late May 2023, Plaintiff's retaliation claim fails for lack of causation in this regard.

With respect to Plaintiff's allegations regarding her placement on a PIP in November 2023, Plaintiff cannot rely on her December 2023 complaints as the protected activity for which Defendant was retaliating, because the PIP came before the complaints. Thus, the Court must determine what was Plaintiff's most recent protected activity at the time she was placed on a PIP. The most recent complaints Plaintiff had made to HR, prior to being placed on the PIP, were in late May and June, after the dissolution of her role and the transition to her new role. *Id.* ¶ 60. Again, Plaintiff's complaints to HR are temporally distant from when she was placed on the PIP.

17

*See Pascual*, 193 F. App'x at 233 (noting that three to four months between the protected activities and the adverse action is "too long to establish a causal connection by temporal proximity alone"). In sum, Plaintiff fails to plausibly plead her retaliation claim on the basis of temporal proximity.

"Where the time between events is too great to establish causation based solely on temporal proximity," Plaintiff must plead other relevant information "to establish causation." *Perry*, 489 F. App'x at 643. Here, Plaintiff alleges in a conclusory fashion that she continued to experience escalated harassment and disparate treatment, and was continually scrutinized, however, she fails to provide sufficient detail to allege that Defendant exhibited "continuing retaliatory conduct and animus" in the intervening periods. *See Lettieri*, 478 F.3d at 650. As such, Plaintiff fails to state a viable claim for retaliation pursuant to Title VII.

### D. Equal Pay Act Claims

In Count V of her Amended Complaint, Plaintiff asserts a claim for pay disparity in violation of the Equal Pay Act ("EPA").[4] Dkt. 40 at 19. The EPA prohibits an employer from paying an employee less than employees of the opposite sex for equal work. 29 U.S.C. § 206(d)(1). To succeed on an EPA claim, a plaintiff must first make a *prima facie* case establishing "(1) the [employer] paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions." *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019).

---

[4] In her Amended Complaint, Plaintiff makes a passing reference to a claim under the Equal Pay Act on the basis of racial discrimination. However, the Equal Pay Act does not apply to situations where employees are paid unequal wages on the basis of race. *See, e.g.*, *Yarborough v. Burger King Corp.*, 406 F. Supp. 2d 605, 609 (M.D.N.C. 2005) ("The Equal Pay Act prohibits wage discrimination on the basis of sex; it does not address racial discrimination."); *Alexander v. Chattahoochee Valley Community College*, 325 F. Supp. 2d 1274, 1293 (M.D. Ala. 2004) ("The Equal Pay Act applies to pay discrimination on only the basis of sex, while Title VII and the equal protection clause also apply to discrimination on the basis of race.").

Plaintiff's Amended Complaint did not sufficiently allege an EPA claim. Plaintiff generically alleges that HII "pa[id] Plaintiff lower wages and lesser benefits than her male counterparts, including compensating her replacement, Melody Walker, at a significantly higher salary than Plaintiff." Dkt. 40 at 19. At the most base level, Plaintiff has not provided any information about specific male counterparts with similar employment responsibilities being paid more than her. Nor has Plaintiff sufficiently alleged that sex discrimination was a cause of the difference in pay between her and her male counterparts. As the Fourth Circuit has held, Plaintiff "may not rely on broad generalizations at a high level of abstraction" when pleading an EPA claim. *Spencer*, 919 F.3d 203. Accordingly, Plaintiff's EPA claim fails on these grounds.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 42) is GRANTED-IN-PART and DENIED-IN-PART. The motion is granted insofar as to Plaintiff's claims under the VHRA, Plaintiff's EPA claim, and Plaintiff's retaliation claim pursuant to Title VII. The motion is denied insofar as it seeks dismissal of Plaintiff's Title VII hostile work environment claim; and it is

FURTHER ORDERED that Counts 2-5 are DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that Plaintiff's Motion for Entry of a Scheduling Order (Dkt. 56) is DENIED as premature; and it is

FURTHER ORDERED that Plaintiff may file any Amended Complaint within FOURTEEN (14) DAYS of the entry of this Memorandum Opinion and Order. If Plaintiff fails to file an Amended Complaint by that date, the Court will assume that Plaintiff is proceeding only on Count 1 and will issue a scheduling order.

It is SO ORDERED.

Alexandria, Virginia
March 12, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge